1   STEVEN G. KALAR
Federal Public Defender
2   CYNTHIA C. LIE
Assistant Federal Public Defender
3   160 West Santa Clara Street, Suite 575
San Jose, CA 95113
4   Telephone:  (408) 291-7753

5   Counsel for Defendant GOMEZ

6

7   IN THE UNITED STATES DISTRICT COURT

8   FOR THE NORTHERN DISTRICT OF CALIFORNIA

9   SAN JOSE DIVISION

10  UNITED STATES OF AMERICA,            )   No. CR-11-00955 DLJ
                                         )
11                        Plaintiff,     )   DEFENDANT'S SENTENCING
                                         )   MEMORANDUM
12  vs.                                  )
                                         )   Date:   April 11, 2013
13  LINDA GOMEZ,                         )   Time:  10:00 a.m.
                                         )
14                        Defendant.     )
    _____)

15

**INTRODUCTION AND FACTUAL BACKGROUND**

16

17      Defendant Linda Gomez's devotion to the care for seniors and the disabled over her adult

18  lifetime earned her the continuing admiration of those who knew her both before and after her

19  offense in the instant case, even those the Probation Office maintains are "vulnerable victims" of

20  her offense.  Sister Sally Slyngstad, formerly the Province Leader for the Sisters of the Holy

21  Names of Jesus and Mary, acknowledges Ms. Gomez' embezzlement from the Order's Los

22  Gatos convent but writes of "her compassion, care and concern for our elderly sisters and her

23  long work hours on their behalf.  She went above and beyond the call of duty in their service,

24  often at the expense of her family."  Exh. B.  Sister Jo'Ann De Quattro, a member of the

25  provincial leadership team from 1992 to 2000, even while expressing her grief at learning of Ms.

26  Gomez' offense emphasizes that Ms. Gomez was "a capable, caring, devoted manager" who

"taught employees the food service trade from dishwasher to become a head chef if that was what they wanted to achieve."  Exh. C.  Sister Joan Doyle, the Community Life Coordinator for the sisters at the Convent from 2001 to 2009, writes:

> Linda's good will and wonderful spirit was seen daily in her relations with the staff members and especially with the Sisters.  It was never too much trouble for her to listen to the many concerns and needs of the Sisters.  They felt welcome to go to her office, write her a note, or just meet her in the halls and seek some advice.  She always made time for them, and followed through on their requests, because she cared about each one.  . . . She was a dear and trusted woman who cared deeply about the Sisters and was very generous with her time and talents.  She was such a joyful person even in difficult circumstances.

Exh. D.  The recognition of Ms. Gomez' good works was not limited to these three sisters, who are united in their request for a non-custodial sentence:  Leen Breesch, a lay employee of the Convent from 1989 to 2000, describes Ms. Gomez as "a good hearted woman to every one around her, especially to the sisters.  Her biggest concern was for the sisters to be happy and feed them the food that they loved. . . .  Nothing was too much for her and she truly loved the sisters and was good for the kitchen staff."  Exh. E.  These letters to the Court, selectively excerpted in the presentence report, are representative of an enduring recognition within the Convent community of Ms. Gomez' good works over nearly 25 years of service, a recognition reflected as well in a larger group of sisters' private and unsolicited communications to Ms. Gomez long after the discovery of her offense, a small sample of which are attached as Exhibits F through U.

Ms. Gomez was first drawn to work with seniors and the mentally disabled once her three children were of age to attend school, attending college classes to prepare her for this work.  PSR ¶ 45.  For ten years thereafter, she managed lunch programs for municipal senior centers and trained disabled students for employment in food service.  In 1986, she was hired by Healthcare Dietary Service as a manager and was soon assigned on a contract basis to work at the Los Gatos convent of the Sisters of the Holy Names.  PSR ¶ 45; 4/3/13 Letter of Lenae Mooney, attached as Exh. A.  She began work at the convent as a cook but quickly earned an excellent reputation with her devotion to the sisters; eventually she was hired away from Healthcare Dietary Service,

1   becoming the manager of the convent kitchen and eventually the manager for housekeeping and

2   purchasing.  As noted by daughter Lenae Mooney: "The sisters became the second family she

3   took care of.  She lived and breathed that job.  She cried with them, celebrated with them, and

4   was there for many as they lived their last days."  *Id.*  Ms. Mooney adds, "This was the perfect

5   job for [Ms. Gomez] as she has always been the person who took care of everyone."  *Id.*  Julie

6   Harrigan, the former administrator for the Convent, joined the Convent several years after Ms.

7   Gomez and recalls that Ms. Gomez struck her as "exceptionally supportive of all of [the sisters],

8   from the youngest to the oldest, above and beyond her job duties, and she earned my respect. . . .

9   She clearly loved the sisters and was committed to their well-being and happiness, and she was

10  adored by them in return. We all thought she walked on water, and she and I became friends."

11  Declaration of Julie Harrigan, ¶ 12.

12      Ms. Gomez, however, came under an unprecedented combination of hardships starting

13  near the end of her second decade of service: after a personal bankruptcy, Ms. Gomez and her

14  family learned that her husband was suffering from late-stage lung cancer stemming from

15  childhood exposure to radiation and carcinogens while growing up in Arizona near a nuclear test

16  site.  PSR ¶ 48.  Ms. Gomez and her family understood the diagnosis to mean he had little life

17  expectancy, especially after a family friend diagnosed at the same time by the same doctor died

18  within the year.  *Id.* at ¶ 48 and Attachment A.  Ms. Gomez was solely responsible for shuttling

19  her husband to and from concurrent chemotherapy and radiation treatments while also

20  continuing full time at work.  *Id.*  At the same time, her middle son, a DSL installer, relapsed

21  into opiate addiction unbeknownst to Ms. Gomez after suffering a workplace injury and began

22  exhibiting the acute financial distress that she only later would recognize as a collateral

23  consequence of his addiction.  *Id.*  Her youngest son, a San Jose police officer, had been living in

24  Modesto to moderate his cost of living but nonetheless was losing his home to foreclosure.  Exh.

25  A.  The financial stress she incurred in her efforts to help her family, her fears for her husband,

26  and the emotional strain of juggling her personal and professional responsibilities in an

1    increasingly unforgiving environment eventually led her to embark on a pattern of compulsive

2    shopping and cash withdrawals using the Convent's corporate credit cards.

3                                                    **ARGUMENT**

4            Notwithstanding the application of USSG § 2B1.1, which the defense submits would

5    advise a range of 21 - 27 months, a significant variance is warranted under 18 U.S.C. § 3553(a)

6    to reflect the extraordinary circumstances under which she ultimately deviated from an otherwise

7    exemplary history of dedicated service to the sisters of the Convent, the wishes of the Convent

8    members who knew her best, and the exceptional burden that a sentence of imprisonment will

9    impose upon her family, given her husband's poor health and inability to care for himself.  A 12-

10   month term of home confinement and lengthy probation grant, under these unique

11   circumstances, would be sufficient and no greater than necessary to achieve the purposes of

12   sentencing.  As another sentencing court observed in *Gall v. United States*, 552 U.S. 38 (2007),

13   "probation, rather than an act of leniency, is a substantial restriction of freedom." *Id.* at 44

14   (internal quotations omitted).  The district court went on to explain:

15           [The defendant] will have to comply with strict reporting conditions . . . . He will not be
             able to change or make decisions about significant circumstances in his life, such as
16           where to live or work, which are prized liberty interests, without first seeking
             authorization from his Probation Officer or, perhaps, even the Court. Of course, the
17           Defendant always faces the harsh consequences that await if he violates the conditions of
             his probationary term.
18
19   *Id.*  The Supreme Court concurred, noting that even the standard conditions of probation

20   "substantially restrict [probationers'] liberty."  *Id.* at 48.  In the present case, Ms. Gomez' age

21   and compromised mobility, her role as her husband's caregiver, and the clear evidence of her

22   honorable service for the vast majority of her employment with the Convent, a Guidelines

23   sentence of imprisonment would constitute disproportionate punishment.

24   / / /

25   / / /

26   / / /

I.      **The Advisory Guidelines Range is Overstated**

   A.      **The Vulnerable Victim Enhancement Does not Apply**

   As a threshold matter, the defense submits that the advisory guidelines range is 21 to 27 months, rather than the 27 to 33 months calculated by the United States Probation Office, because it is the corporate entity of the Sisters of the Holy Names of Jesus and Mary – not the individual sisters of that order – that was the victim of Ms. Gomez' offense within the meaning of USSG § 3A1.1(b)(1), and the government has established neither any particular vulnerability on the part of the order or its provinces, nor any injury or loss to any individual sister, vulnerable or otherwise.

   1.      **The Victim of the Offense is the Administration of the Convent, Not the Sisters**

   Ms. Gomez' fraud consisted of inducing the Convent administration to pay for her use of the corporate credit card accounts to make purchases that she contended were properly billed to the Convent's budget, specifically the budget she managed for food services and housekeeping and purchasing for the community.  The Convent budget, approximately $4.3 million in 2009, was separate and distinct from the individual sisters' personal budget allocations, though both were funded from the same master account maintained by the California province of the Order. *See* Declaration of Julie Harrigan, ¶¶ 3, 14.  As Sister Joan Doyle recognized in her letter to the Court, "I believe that she did not intend any harm to the elder Sisters or the staff."  Exh. D.  The sisters' personal budgets were determined by the province on an annual basis, based upon the sisters' projected needs for the year, not on the financial condition of the Convent or province as a whole, and represented a tiny fraction of both the wealth of the Order and the personal contributions they made to it through their surrendered personal retirement benefits.  There is no evidence of any impact on these personal budget allowances as a consequence of Ms. Gomez' embezzlement from the Convent budget ($4.3 million in 2009), nor is there any evidence that Ms. Gomez' fraud jeopardized the Convent budget, the province's financial health or any of the

1  Convent's customary activities.  On the contrary, Ms. Gomez never exceeded the annual budgets

2  approved in advance for food services, housekeeping or community purchasing.  The sisters

3  themselves were not, therefore, victims of Ms. Gomez' offense conduct.

**2.      Even if the Sisters Could be Deemed Victims of the Offense, They Were Not Unusually Vulnerable**

A victim is "unusually vulnerable" when she is "less able to resist than the typical victim

of the offense of conviction." *United States v. Wetchie*, 207 F.3d 632, 634 (9th Cir. 2000); *see*

*also United States v. Luca*, 183 F.3d 1018, 1027 (9th Cir. 1999) (stating that the district court

must point to facts that made the victim "less able to defend [herself]  than a typical victim");

*United States v. Nielsen*, 694 F.3d 1032, 1034-35 (9th Cir. 2012). It is not sufficient to invoke

the age or infirmity of any the sisters, without any evidence that their age or physical condition

made them particularly susceptible to Ms. Gomez' embezzlement.  *See*, *e.g.*, *United States v.*

*Lee*, 973 F.2d 832, 834 (10th Cir. 1992) (reversing imposition of enhancement for bank

employee who embezzled funds by helping elderly female customers fill out deposit slips and

redirecting their deposits to accounts under her control).  Nor is it sufficient that a person or

persons have been an "instrumentality" to a defendant's scheme as opposed to a victim of it.

*United States v. Johns*, 686 F.3d 438, 459 (7th Cir. 2012).

To the extent that the Probation Office presumes the sisters to have been "trusting in

nature from the dogma of their religion," there is no evidence to suggest that this in any way

impacted the lay administration's decisions to reimburse or not Ms. Gomez' use of the Convent's

corporate card from the Convent budget.  Moreover, the sisters' religious faith did not render

them insensible, incompetent or impaired to a degree that renders Ms. Gomez' conduct more

depraved than the uncontested application of the abuse of private trust enhancement already

reflects.  The Probation Office contrasts the individual sisters' modest personal budgets with Ms.

Gomez' expenditures but disregards the bare fact of the sisters' election to surrender any

personal assets.  The relevant comparison is not as between Ms. Gomez' lifestyle and that

Defendant's Sentencing Memorandum
CR 11-00955 DLJ                                    6

chosen by the sisters, but between the competency or unusual inability of those individual sisters deemed victimized by the offense to detect or protect against fraud, as against the typical victim of fraud. The sisters, to the extent that the Probation Office persists in conflating these individuals with the corporate entity of the Convent or province, had the benefit of lay administrators, treasurers, accountants, lawyers and bookkeepers to scrutinize budgets and expenditures, as well as comprehensive insurance against employee fraud.

**B.     A Variance is Warranted to Mitigate the Application of USSG § 2B1.1(b)(9)(A)**

Although an adjustment under USSG § 2B1.1(b)(9)(A) may appropriately be imposed under the prevailing interpretation of that Guideline, a downward variance is warranted to account for the circumstance that Ms. Gomez did not exploit the charitable or religious impulse of the organization's financial administration in inducing them to fund the expenses for which she sought reimbursement, in contrast to the more typical scenario in which such an adjustment is imposed.

USSG § 2B1.1(b)(9) authorizes the Court to impose a two-level increase where a defendant misrepresents, as part of a scheme to defraud, that she is acting on behalf of a charitable or religious organization or a government agency. The illustrative examples provided by the Commission in the Application Notes each involve the fraudulent solicitation of contributions by appealing to the charitable impulses of victims through false claims that the contributions would fund a qualifying organization:

Subsection (b)(9)(A) applies, for example, to the following:

(i)     A defendant who solicited contributions for a non-existent famine relief organization.

(ii)    A defendant who solicited donations from church members by falsely claiming to be a fundraiser for a religiously affiliated school.

(iii)   A defendant, chief of a local fire department, who conducted a public fundraiser representing that the purpose of the fundraiser was to procure sufficient funds for a new fire engine when, in fact, the defendant intended to divert some of the funds for the defendant's personal benefit.

*Id.* at n. 7. The courts are divided on the application of this enhancement in cases where, as here

1   the defendant did not exploit the generosity, charitable motives, or trusting impulses of the

2   victim.  The Ninth Circuit, and the majority of circuits, has held that the enhancement applies so

3   long as the defendant misrepresents her affiliation with the qualifying organization and/or her

4   capacity to act for the organization, whether or not the victim was motivated by charitable

5   impulse to succumb to the scheme to defraud.  *See United States v. Lambert*, 498 F.3d 963 (9th

6   Cir. 2007); *United States v. Berger*, 224 F.3d 107 (2d Cir. 2000); *United States v. Bennett*, 161

7   F.3d 171 (3d Cir. 1998); *United States v. Aramony*, 166 F.3d 655 (4th Cir. 1999); *United States*

8   *v. Wiant*, 314 F.3d 826 (6th Cir. 2003); *United States v. Reasor*, 541 F.3d 366 (5th Cir. 2008);

9   *United States v. Ferrera*, 107 F.3d 537, 543 (7th Cir. 1997).  However, the Tenth Circuit

10  requires exploitation of charitable motive: "the conduct intended to fall within the scope of the

11  guideline is exploitative conduct which induces victims to act upon their charitable or trusting

12  impulses due to the defendant's misrepresentation that he has authority to act on behalf of a

13  charitable, educational, religious or political organization or a government agency."  *United*

14  *States v. Frazier*, 53 F.3d 1105, 1113 (10th Cir. 1995).

15         Ms. Gomez made no appeal to the charitable or spiritual impulses of the Convent

16  administration: the Convent had a pre-existing duty to provide for the sisters who resided there

17  and to fund the various budgets it had approved for the different Convent managers.  Ms.

18  Gomez's misrepresentations were made to the Convent administration, the same entity on whose

19  behalf she claimed to be spending the funds sought, not to some third party whose generosity

20  prompted a charitable contribution or tithing.  The defense does not dispute that under Ninth

21  Circuit law, application of the enhancement is warranted.  However, this Court is free to grant a

22  variance from the advisory range thereby calculated, if it finds that under the circumstances

23  presented in this case – the uncontested imposition of a two-level enhancement for abuse of trust

24  and the absence of any exploitation of charitable motive – unmitigated imposition of the

25  enhancement would result in an unreasonable sentence.

26  / / /

## II.     A Substantial Downward Variance from the Advisory Range is Warranted, Due to Mitigating Factors Relating to Ms. Gomez' Background and History

### A.     Ms. Gomez' Offense Conduct Was Fueled by the Emotional And Financial Strain from the Convergence of Multiple Extraordinary Familial Pressures

Ms. Gomez' employment at the Convent was in all respects exemplary prior to her commencement of the offense conduct.  Despite having been directed to have no involvement with the case, a number of sisters have continued to reach out to Ms. Gomez subsequent to the widespread publication of government press releases regarding the offense.  Their expressions of support for her in spite of her crimes reflects the extent to which they appreciate that her offense conduct was highly uncharacteristic of the person the sisters had grown to love and respect:

> How blessed I am to have known both of you! . . . . You have been an inspiration of goodness and generous love to all!

> [Y]ou are in my thoughts and prayers each day.  It is so puzzling why some "experiences" come into our lives however it is important for you to know how much so many folks love and support you!

> We miss you – I hope things are going better – some day our lives may get more normal with God's help.

> We miss you and continue to pray for the best outcome for you and your family.  Just knew we love and continue to support you. . . . You [are] in our prayers and thought always with much love and gratitude for you both.

> I read the article in the paper this morning.  My heart goes out to you.  Whatever occurred I have very fond memories of working with you at the convent, and I will remember your many kindnesses to me and the sisters.

Exhs. F - U.  These are the sisters whom the Probation Office would denigrate as blindly trusting in their Christian charity, as though they were unfamiliar with post-Edenic concepts of sin and human failing, but these sisters have been able to see past the caricature of Ms. Gomez invited by media reports and to discern that her commission of the offense against the Convent treasury does not negate the exceptional personal good will and devotion that she had long demonstrated in their service.  They likewise have discerned that the circumstances which fed Ms. Gomez' compulsion to steal from the Convent finances were substantially mitigating.

/ / /

The defense does not suggest that Ms. Gomez was entitled to the money she embezzled by virtue of her family circumstances, or that she acted out of necessity: Ms. Gomez accepted responsibility for her offense, signaling her intention to plead guilty early in these proceedings and ultimately pleading guilty to all 17 counts of the indictment. However, her resort to the Convent credit card was the product of significant emotional anguish, rather than cavalier or antisocial disregard; her attempts to conceal those compulsive expenditures were in turn a desperate and dishonorable effort to keep the evidence of her weakness from the administration whose trust she had once worked so hard to earn.

### B.   A Variance is Warranted in View of the Heightened Burden of Incarceration on Ms. Gomez and Her Family

Although her husband is in remission from his lung cancer, the continued impairment of his respiratory function – due to chronic obstructive pulmonary disease and the scarring of his lungs due to the cancer – leaves him susceptible to lung infections and pneumonia, including a recent hospitalization during which Ms. Mooney believed he would not recover. Exh. A. He has also suffered two heart attacks, the second in the immediate aftermath of the media reports of Ms. Gomez' indictment. *Id.* The combination of his age and the grueling course of chemotherapy he underwent in 2007 has left him sufficiently forgetful that he cannot independently keep track of either his medications or his medical appointments. *Id.* Consequently, Ms. Gomez has dedicated herself to being his 24-hour/day care-giver, in spite of her own limited mobility. *Id.* Moreover, Ms. Gomez and her husband relocated to Arizona because they were unable to afford the cost of living in this district on Social Security and John Gomez' modest pension. Because her Social Security benefits will be suspended for the duration of any term of imprisonment, her husband will be unable to remain in their current residence. While all of the three children would unhesitatingly take in their father, none of them lives in a home that could accommodate his limited mobility, and none is in a position to provide him with the round-the-clock care that Ms. Gomez has traditionally provided.

1       Of greater concern is the physiological impact the family fears the emotional strain will

2   cause Mr. Gomez.  Due to his second heart attack and their belief that it was triggered by the

3   stress of learning of Ms. Gomez' indictment, the family is acutely fearful of a third and more

4   devastating cardiac event.  Ms. Gomez has scrupulously refrained, at great personal cost, from

5   sharing with him her fears for the future, as has her daughter:

6         For someone who for so much of her life was honored to be of service to the sisters she
    loved and the family she cared for, knowing that the world sees her only as the lady who
7   stole from the nuns is crushing and humiliating and already was the worst kind of
    punishment she could imagine, but now she also has to fear that her sentence will kill the
8   love of her life and take a father from his kids and a grandfather from his grandchildren.
    She is and will suffer from
9   this for a long time.

10  Exh. A.

11                      **CONCLUSION**

12      For the foregoing reasons, the defense respectfully moves this Court to consider a

13  sentence of home confinement, in consideration of the devotion she has engendered among the

14  very sisters now being exploited as the poster children for her offense, the potential harm to her

15  family, and the extraordinary circumstances that fueled her offense conduct.

16

17  Dated: April 4, 2013

18                           Respectfully submitted,

19                           STEVEN G. KALAR
                             Federal Public Defender

20

21                           s/
                             CYNTHIA C. LIE
22                           Assistant Federal Public Defender

23

24

25

26